# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

Case No. _____



LAKE WORTH FOR GLOBAL JUSTICE, INC.,

        Plaintiff,

v.

CITY OF MIAMI; JOE ARRIOLA, in his official
capacity as the City Manager of the City of Miami;
JOHN TIMONEY, in his official capacity as the
Chief of Police for the City of Miami Police
Department; WILLIAM BRYSON, in his official
capacity as the Chief of the Fire Rescue Department
of the City of Miami,

        Defendants.

_____/





**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF AN APPLICATION FOR A TEMPORARY RESTRAINING ORDER;
DECLARATIONS AND EXHIBITS**

**INTRODUCTION**

Plaintiff Lake Worth for Global Justice, Inc. ("Group") challenges three sections of Miami's Code (Code), each regulating the use of traditional public fora. These provisions violate black letter First Amendment law both on their face and as the City has applied them in the past several months. First, the challenged Code requires a license for every parade, assembly and special event to engage in core expression on a sidewalk or in a street under a permitting scheme that is unconstitutionally vague. The Code lacks any standards and guidelines to check the unbridled discretion of City officials to condition a license to speak on invidious content-based considerations.

Second, the City's Code imposes sweeping restrictions on even a single person being on any public sidewalk if the presence of that person, in any way and to any extent, obstructs free passage.

Third, through a supplemental ordinance adopted specifically for the recent meeting of the Free Trade Area of the Americas (FTAA), the City has imposed broad restrictions on all parades involving seven or more persons in a street, and all public assemblies involving eight or more people gathered for a common purpose outside a structure for more than 30 minutes. Even if the City could prove a significant interest to support this provision, this ordinance does not fit because it is woefully under-inclusive as it bars possession of the enumerated items only for those who: 1) "parade" on a street or 2) have a common purpose and assemble together outside a structure for longer than 30 minutes. Those who "parade" on a sidewalk are not reached by the ordinance and those who assemble for less than 30 minutes, or assemble other than outside a structure, or who share no "common purpose" are not subject to the sign restrictions and other proscriptions of this section. Moreover, while the plain language of this section only restricts what those in a parade or public assembly of more than 30 minutes may do, the City has applied this law to restrict public assemblies to no more than 30 minutes and has arrested and prosecuted individuals after the elapse of the thirty-

1

minute assembly period solely for the failure to disperse, without any inquiry or concern as to whether such persons possess any of the banned items listed in the Code.

Miami's Code, requiring a license for virtually all speech in public fora, is overbroad, employs vague terms and lacks standards to limit the discretion of public officials vested with permit authority.   The City cannot defeat the presumption of unconstitutionality with which all prior restraints come before this Court.  Nor can the Code stand as reasonable time, place or manner rules. The City applied these sections recently to inhibit speech in conjunction with the FTAA protests and, unless enjoined by this Court, is likely to apply them in an unlawful manner in the immediate future. Because Plaintiff and others face the very real risk of prosecution if they violate these laws, their choice is to self-censor their First Amendment activities or risk criminal charges.   This is an alternative the Constitution will not brook.   Accordingly, a temporary restraining order and preliminary injunction should issue to enjoin enforcement of the challenged Miami Code sections.

## STATEMENT OF FACTS

Plaintiff is an incorporated association in the state of Florida.  It is an activist collective committed to taking action for social justice.  The Group is located about 60 miles north of Miami. Plaintiff engaged as a collective in the FTAA protests in Miami and continues to be part of the post-FTAA demonstration issues and ongoing trade economic justice issues in Miami.  During the recent FTAA protests, members of the Group were stopped in Miami by the police, detained and searched. The Group participated in various rallies during the FTAA and was subject to orders to disperse when members engaged in lawful activities, including the events outside the amphitheater following the AFL-CIO sponsored march on November 20, 2003, and the jail solidarity rally the next day. Both events were the subject of orders to disperse, without proper notice, and police use of less-lethal weapons and tear gas, which the Group observed.  Individuals with whom the Group regularly

2

works in the global justice movement were arrested in the anti-FTAA protests solely for being a part of public demonstrations or failure to obey an order to disperse.  Several persons who assisted the Group to make large puppets used in the anti-FTAA rallies were also arrested.  Declaration of Cara Jennings (Jennings Dec.) at ¶1.  The Group intends to protest the police actions at the FTAA and, specifically, plans to engage in lawful protests outside City Hall, where the Civilian Investigation Panel (CIP) will hear testimony from Chief Timoney on Thursday night, February 5th. *Id.* at ¶2.

Plaintiff does not know if it is too late to file for a permit, but, in any event, is unwilling to agree to the risk and liability provisions in the Code.  Jennings Dec. at ¶¶ 5,6.  Plaintiff expects at least eight people will gather on the public sidewalk outside City Hall, holding signs in opposition to Timoney and engaging in other peaceful expression.  Jennings Dec. at ¶ 4 .  Some members of the Group plan to be on the sidewalk adjacent to Bay Shore Drive, to "speak" to the broader public. Although the Group plans to keep both sidewalks open for pedestrians, it fears that, if people stand on the sidewalks without a permit, they will be arrested, especially if eight people remain on the sidewalk for more than 30 minutes, or if the police decide that their presence is obstructing the free passage of pedestrians to any degree. Plaintiff does not want to risk arrest.  Jennings Dec. at ¶ 4.

**The Miami Code Sections:**

### 1. Section 54-2: "Obstruction of free passage on sidewalks, etc."

Section 54-2 states an intent, *inter alia*, "to eliminate the obstruction of free passage over, on or along a street or sidewalk, which obstruction results from the manner in which a person or number of persons shall stand, loiter or walk on said street or sidewalk."  City of Miami, Fla., Code § 54-2(a)(2003).[1]  It is "unlawful for any person or any number of persons to so stand, loiter or walk

---

[1] True and correct copies of the relevant sections of the Miami Code are attached at Exhibit 1 (Section 54); Exhibit 2 (Section 54-6.1) (Section 54 adopted November 13, 2003); and Exhibit 3 (Section 1-13) (penalty).  The Code is on the City's website: http://www.ci.miami.fl.us

upon any street or sidewalk in the city so as to obstruct free passage over, on or along said street or sidewalk after a request by a law enforcement officer to move on so as to cease blocking or obstructing free passage thereon." § 54-2(b).  It applies "only when a person or number of persons shall stand, loiter or walk on a street or sidewalk so as to obstruct free passage and shall refuse to obey a request by an officer to move on; mere refusal to move on after a law enforcement officer's request to move on is not enough to support the offense.  There must be an actual blocking of free passage over, on or along said street or sidewalk." §54-2(c). Actionable obstruction is not defined.

### 2.   Section 54-3 et seq. "Permit required to obstruct or close street or sidewalk or impede traffic; fees; waiver of fees."

Sections 54-3 through 54-6 set forth the City's permit requirements for engaging in all expressive activities in public fora.  Section 54-3 [Ex. 1, pp. 1 and 2] mandates that:

> (a) No person shall obstruct, close or cause to be obstructed or closed any street or sidewalk in this City or impede the general movement of vehicular or pedestrian traffic without first having obtained a permit from both the police and fire-rescue departments.  In the case of special events and festivals, an additional permit must also be obtained prior to the event/festival from the department of public works. . . . [Permits] shall issue . . . only after approval . . . has been granted by the city manager . . . said approval contingent upon favorable recommendation by said departments for the issuance of said permits.

Section 54-3 (c) [Ex. 1, p. 2] requires that a permittee:

> [as] a condition precedent to the issuance of any such permit shall assume all civil liability for his acts of omission or commission and shall, further, hold the city harmless <u>for any acts arising or resulting from the issuance of said permit and any omissions or commissions on the part of the city</u>.  (Emphasis supplied.)

The Code imposes an even more onerous burden in Section 54-6(e) [Ex. 1, p.4]  This section states: "By applying for and being granted such permit, the applicant shall assume all civil liability arising from conditions, restrictions, or omissions on the face of the permit." *Id.*

─────────────────────

and the section City Ordinance at the "Residents Services" section on the City's home page.

In addition, the Code requires an applicant to submit proof of insurance in "an amount not less than $50,000.00 per person, $100,000.00 aggregate, . . . whichever is greater. § 54-3(c) (emphasis supplied). Ex. 1, p. 2. The Code also sets fees for filing an application and for the use of public fora for "special events;" however the fees may be "waived or reduced" at the discretion of the City if such "a waiver or reduction is in the city's best interest." § 54-3(d).[2] Ex. 1, p.2.

Section 54-6(a) makes the permit requirement applicable to any "procession or parade" unless it is conducted by a federal or state government military or paramilitary organization. Id. Ex. 1, p. 3. The Code provides no set time by which an application for a permit must be filed, advising only that it be filed "sufficiently in advance of the proposed parade or procession to allow adequate arrangements to be made for the proper policing of [the procession or parade]." § 54-6(b). Ex. 1, p. 3. There is no exception for "spontaneous speech" in the City's Code.

### 3. November, 2003 Amendment to Chapter 54 of the Code "Streets and Sidewalks"

On the eve of the FTAA demonstrations in November 2003, the City adopted an ordinance amending Chapter 54 of the Miami Code to add Section 54-6.1. Ex. 2. This measure added a definition of the term "parade" to mean "a coordinated movement of seven (7) or more pedestrians or vehicles upon the streets, within the city with an intent of attracting public attention that interferes with or has a tendency to interfere with the normal flow or regulation of traffic upon the street." Ex. 2, p. 3; § 54-6.1(a). It also defined the term "public assembly" to mean "a gathering outside a structure of more than eight (8) persons for a common purpose at a public place that continues in existence for more than thirty (30) minutes." Id. Section 54-6.1(b) sets out ten limits on what

---

[2] Although this section is not being challenged at this time, plaintiffs believe that it is fundamentally inconsistent with the First Amendment because it imposes a substantial burden on free speech. Indeed, to stand on a street corner and preach, an individual would need insurance in the amount of at least $50,000. If four individuals stood stationary outside the courthouse on the public sidewalk with signs, they would need a permit and $200,000 in insurance.

participants in a parade or public assembly may possess, including various weapons, materials used for signs and to attach to signs, etc.  Ex.2, pp. 3-5.

### 4.    The Penalty for a Violation of the Code

A violation of any of section of the Code is a misdemeanor punishable by a fine of up to $500 or imprisonment at "hard labor on the streets or other works of the city for not more than 60 days," or both.  Exhibit 3, Code Section 1-13.

## ARGUMENT

## I.    PLAINTIFF HAS STANDING TO CHALLENGE THE MIAMI CODE

Plaintiff has standing to bring a facial challenge to the Miami Code sections on two bases. First, it has standing as an entity subject to the requirements of the permit scheme. *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 755-56, (1988).  Plaintiff plans to engage in expressive activities covered by the Code to protest the police brutality at the recent FTAA meetings in Miami and the testimony of police officials before the Civilian Investigation Panel ("CIP") for the City of Miami. Jennings Dec. at ¶ 2.

Plaintiff also has standing because of Code's potential to chill the protected expression of others not now before the Court.  Under this well-established exception to Article III standing, challenges may be made to "laws that are written so broadly that they may inhibit the constitutionally protected speech of third parties. [Citation.]" *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798, (1984).  Both "the Supreme Court and this [Circuit] consistently have permitted facial challenges to prior restraints on speech without requiring the plaintiff to show that there is no conceivable set of facts where the application of the particular government regulation might or would be constitutional [Citations.]" *United States v. Frandsen*, 212 F.3d 1231 (11th Cir. 2000) (bracketed edits supplied]. *Accord, Abramson v. Gonzalez*, 949 F.2d

6

1567, 1573 (11th Cir.1992) (facial challenge proper as the rule "affects the enjoyment of freedoms which the Constitution guarantees and subjects the exercise of First Amendment freedoms to licensing requirements") [internal citations and quotation marks omitted]. When free speech may be chilled, society's interest in reviewing an unconstitutional law offsets the usual concern of federal courts to avoid deciding constitutional questions when possible. As the Supreme Court held in *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 129-130 (1992):

> [I]n the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable. . . . This exception from general standing rules is based on an appreciation that the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court.

## II.   STANDARDS FOR GRANTING OF A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION

In the Eleventh Circuit, a temporary restraining order is proper if the plaintiff establishes four elements: (1) a substantial likelihood of success on the merits; (2) the likelihood of irreparable injury unless the injunction issues; (3) the balance of harms tips in favor of the moving party; and, (4) if issued, the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301 (11th Cir. 1998). Plaintiffs readily meet each part of this test.

## III.   THERE IS A SUBSTANTIAL LIKELIHOOD THAT THE GROUP WILL HAVE SUCCESS ON THE MERITS

### A.   The Miami Permit Scheme Is a Prior Restraint That Violates the First Amendment as an Impermissibly Vague and Overbroad Law

#### 1.   The Miami Permit Scheme Is a Prior Restraint

"A prior restraint on expression exists when the government can deny access to a forum for expression before the expression occurs." *Frandsen*, 212 F.3d at 1236-37. Miami's permit scheme is such a prior restraint because the City Manager may deny the use of fora for expression by denying

a permit based solely on an unexplained and standardless "unfavorable recommendation" by the police, fire or public works department.  Ex. 1, Miami Code Section 54-3(a).  In *Frandsen*, this Circuit reiterated the well-established rule that: "Although prior restraints are not *per se* unconstitutional, there is a strong presumption against their constitutionality." *Id.* at 1237, citing *FW/PBS. Inc. v. City of Dallas.* 493 U.S. 215, 225, (1990) (O'Connor, J.) (plurality opinion).  This is so as a "[p]rior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect against abridgment." *Carroll v. Pres. & Commissioners of Princess Anne,* 393 U.S. 175, 181, (1968).  The "twin evils" of a prior restraint are the potential for unfettered discretion of government officials and the absence of adequate procedural safeguards to protect against censorship. *FW/PBS.* 493 U.S. at 225.  The Miami Code permit sections suffer from both.

### 2.   The Miami Ordinance Lacks Adequate Standards to Check the Unbridled Discretion of Officials in Implementing This Permit Scheme

It is black letter law that any attempt to subject "the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority is unconstitutional." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 150-51 (1969).  *See also, Forsyth County,* 505 U.S. at 132.  A law regulating speech in public fora fails if it "delegate[s] overly broad licensing discretion" to officials. *Id.* at 130.  "A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Id.* (citation omitted).  "To curtail that risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth County,* 505 U.S. at 130-31 [internal quotation marks and citation omitted].

Standards provide the guideposts that check the licensor and allow courts quickly and

> easily to determine whether the licensor is discriminating against disfavored speech.
> Without these guideposts, post hoc rationalizations by the licensing official and the
> use of shifting or illegitimate criteria are far too easy, making it difficult for courts to
> determine whether the licensor is permitting favorable, and suppressing unfavorable
> expression.

*City of Lakewood*, 486 U.S. at 758 [citation omitted].[3]  Because the City's scheme lacks the narrow

and specific guidelines needed to check official discretion, necessarily, it is not "narrowly drawn"

as the First Amendment demands of a prior restraint.[4]

It is of no moment if Miami has never engaged in invidious content-based application of the

ordinances.  The success of a facial challenge to a permit scheme on the basis that it "delegates overly

broad discretion to the decision-maker rests not on whether the administrator has exercised his

discretion in a content-based manner, but whether there is anything in the ordinance preventing him

from doing so."  *Forsyth*, 505 U.S. at 133 and n.10;  *accord, City of Lakewood*, 486 U.S. at 757

("mere existence of licensor's unfettered discretion, coupled with the power of prior restraint,

intimidates parties into censoring their own speech, even if the discretion and power are never

actually abused"); *Thornhill v. Alabama*, 310 U.S. 88 (1940) ("Proof of an abuse of power in the

particular case has never been deemed a requisite for attack on the constitutionality of a statute

purporting to license the dissemination of ideas.") [citations in *Thornhill* omitted].

Because Miami's Code permits public officials to decide on an *ad hoc* basis whether a permit

---

[3] Even content-neutral time, place and manner rules must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002). *See.* Section III.5.2 at p. 14, *infra*.

[4] The invitation to engage in content-based decisionmaking inherent in the unbridled discretion vested in Miami officials to implement these vague laws is not alleviated by the City's application process.  To the contrary, it is exacerbated by the Special Events Application, which covers parades and special events identified as political and religious, must provide the following information: "How Does This Event Benefit the City of Miami?" Exhibit 4, Special Event Application.  Not only is this a vague requirement, but a permit to engage in core expression may not be made to depend upon the benefit of such speech to the City.

application has been submitted sufficiently far in advance and, at the same time, provides no time by which a permit application must be acted upon no matter how long in advance it is submitted, the Code is invalid. It would permit City officials to hold an application until the last moment, only then to deny it for unspecified reasons, leaving the applicant with no opportunity to seek prompt judicial review of the denial of a permit. This Circuit has underscored the bedrock rule that neither this Court nor the public can "depend on the individuals responsible for enforcing [a regulation] to do so in a manner that cures it of constitutional infirmities[.]" *Frandsen*, 212 F.3d at 1240 [citation omitted].

In *Frandsen*, this Circuit invalidated a law that required officials to issue a permit "without unreasonable delay," but did not contain any standards to give the government, "the public, or any reviewing court, . . . any guidance as to what is considered 'unreasonable.'" 212 F.3d at 1240. Like the statute challenged in *Frandsen*, Miami's Code "fails to put any real time limits on the [decision maker]." *Id.*, *citing Lady J. Lingerie v. City of Jacksonville*, 176 F.3d 1358, 1363 (11th Cir. 1999). The Miami Code fails "to confine the time within which the licensor must make a decision[,]" *FW/PBS*, 394 U.S. at 226-27, making it an unconstitutional law that "'risks the suppression of protected expression for an indefinite time period prior to any action.'" *Frandsen*, 212 F.3d at 124 (citation omitted). On this basis alone, Sections 54-3 and 54-6 must be stricken and the entire parade/assembly permit scheme fails since there is no lawful requirement to file an application.

### 3.    Section 54-3 Lacks Adequate Procedural Safeguards

In addition to the need for adequate standards to limit the discretion of officials charged with enforcing a permit scheme for expressive activity, a prior restraint must also contain procedural safeguards to ensure that protected expression is not inhibited. The licensing scheme must provide, at a minimum, for prompt judicial review in the event the permit is denied or unduly burdened.

*Freedman v. Maryland,* 380 U.S. 51, 58-59 (1965).[5] *See Forsyth County,* 505 U.S. 123.   Miami's Code misses the mark entirely as it is devoid of any requirement that a permit be decided within a narrow set time and that appeal or prompt judicial review of a denial or grant of a permit burdened by impermissible conditions be provided. *See Redner v. Dean,* 29 F.3d 1495, 1502 (11th Cir. 1994) ("ordinance . . . inadequate under any interpretation of 'prompt judicial review' because it creates the risk that expressive activity could be suppressed indefinitely prior to any judicial review of the decision to deny a license"). The lack of such safeguards, coupled with unbridled discretion to decide a permit request, invites and insulates content-based decision making, invalidating the entire scheme.

### 4.      Section 54-3 et seq. Fails to Allow for Spontaneous Expressive Activities

Miami's failure to include a reasonable and definite advance filing time and the failure to set a reasonable and definite time by which a permit, once filed, must be acted upon is compounded by the complete absence of any provision for "spontaneous" expression in response to timely events. This deficiency has been the basis for invalidating similar ordinances over the past 35 years.   The United States Supreme Court has condemned permitting schemes that do not allow for spontaneous expressive activities precisely because "timing is of the essence in politics . . . and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth,* 394 U.S. at 163.  So, whether it is a response to police brutality at the FTAA demonstrations or fast-breaking global events, not only is there "a significant amount of spontaneous

_____

[5]  In contrast to the content-neutral permit scheme at issue in *Thomas,* 534 U.S. at 318, that applied across the board to any group of more than 50 people who wanted to use the public parks, the Miami ordinance is expressly directed at protected expression (parades, processions, and public assemblies) in all public fora.  The Chicago Park District ordinance also contained an explicit condition that a permit, generally, must be decided within 14 days and could be denied only on specified grounds with a written explanation. *Id.*  A prompt appeal process was also part of the law. *Id.*  Each of the factors that saved the regulation in *Thomas* is missing here.

speech that is effectively banned by the ordinance[,]" *Watchtower Bible & Tract Society v. Stratton*, 536 U.S. 150, 160 (2002), there is a total ban on spontaneous speech in Miami because <u>any</u> event that would, potentially, result in "obstructing" a sidewalk or street to any degree would be barred without a permit. And, if the government, in its unfettered discretion, decides there is not adequate time for it to plan, a permit would be denied.

Relying on the decisions of the Ninth Circuit in *NAACP v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1985), and the Eighth Circuit in *Douglas v. Brownell*, 88 F.3d 1511 (8th Cir. 1996), the Seventh Circuit recently invalidated a permit scheme that lacked adequate provision for spontaneous expression. *Church of the American Knights of the Ku Klux Klan v. City of Gary, Indiana* ("CAKKKK"), 334 F.3d 676 (7th Cir. 2003). Writing for the Court, Judge Posner underscored that, while advance notice requirements are "reasonable[] in general," *id.* at 682, the failure to include an "exception for spontaneous demonstrations unreasonably limits free speech." *Id.* Even the City of Gary's "unwritten policy of waiving the permit requirement for a 'spontaneous' demonstration, but only if the demonstration is 'not planned,'" was not enough to save the ordinance because the "scope of the dispensation is opaque." 334 F.3d at 682. By contrast, Miami does not even provide for the amount of "spontaneous" speech insufficient to save the law in Gary. Thus, Miami's Code fails.

### 5.    Miami's Code is Not a Reasonable Time, Place or Manner Regulation

Miami regulates core expressive activities in all streets and on sidewalks. "In such places, which occupy a 'special position in terms of First Amendment protection,' *United States v. Grace*, 461 U.S. 171,180 [] (1983), the government's ability to restrict expressive activity 'is very limited.' *Id.* at 177." *Boos v. Barry*, 485 U.S. 312, 318 (1988). In traditional public fora, the government may regulate the time, place, and manner of expression so long as the restrictions "are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative

channels of communication." *Grace*, 461 U.S. at 177 [internal quotation marks and citations omitted]. *Accord*, *Forsyth County*, 505 at 130 (same). The failure to meet any one of these prongs is fatal to the entire law. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45, 103 S.Ct 948, 74 L.Ed.2d 794 (1983). Miami's permit scheme fails as it violates all three prongs.

### a.      The Miami Code is Not a Content-Neutral Regulation

To pass constitutional muster, a time, place or manner regulation of speech in a traditional public forum must be "justified without reference to the content of the regulated speech, . . . narrowly tailored to serve a significant governmental interest, and [must] . . . leave open ample alternative channels for communication[.]" *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293, (1984). If the grant or denial of a permit rests on the "appraisal of facts, the exercise of judgment, and the formation of an opinion," it is content-based and the "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great to be permitted." *Forsyth*, 505 U.S. at 131 [internal citations omitted]. Miami's ordinance does not identify any of the bases on which permit decisions are to be made. Officials are free to make the decision with reference to who wants to speak and what they want to speak about and, if it is a disfavored speaker, simply make an "unfavorable recommendation." For this reason, the Miami permit scheme cannot be said to be content-neutral.

### b.      Even if content-neutral, the Code is not a reasonable time, place or manner regulation as it is not narrowly tailored and does not allow for ample alternatives for communication

#### (1).      The Miami Code is not narrowly tailored

"A government regulation that allows arbitrary application is 'inherently inconsistent with a valid time, place and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view.'" *Forsyth County*, 505 U.S. at 132 [citation omitted]. In *Thomas*, the Supreme Court noted that, even with a content-neutral law, "[w]here the licensing

13

official enjoys unduly broad discretion in determining whether to grant or deny a permit, there is a risk that he will favor or disfavor speech based on its content." 534 U.S. at 323, *citing Forsyth County*, 505 U.S. at 131. To avoid this risk, the Court has "required that a time, place and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review." 534 U.S. at 323, *citing Niemotko v. Maryland*, 340 U.S. 268,1951).

The ordinance in *Thomas* expressly limited the bases for denying a permit, required applications to be processed within 28 days and written explanations for denials of permits. 534 U.S. at 32. The Court found these grounds sufficiently specific and objective and eliminated decisions at the "whim of the administrator." *Id.* at 32, *citing Forsyth County*, 505 U.S. at 133. "They provide 'narrowly drawn, reasonable and definite standards' to guide the licensor's determination. . . . And they are enforceable on review – first by appeal to the General Superintendent of the Park District, . . . and then by writ of common-law certiorari in the Illinois courts[.]" 534 U.S. at 32.

By contrast, Miami's Code contains no standards for granting or denying a permit other than a favorable or "unfavorable" recommendation from the police and/or fire departments. The absence of the safeguards present in *Thomas* and other cases compels the conclusion that Miami's permit scheme is unconstitutional. *See City of Lakewood*, 486 U.S. at 769-70 (discretion impermissibly unfettered where official may impose "such other terms and conditions deemed necessary"); *Shuttlesworth*, 394 U.S. at 156-58 (unbridled discretion in regulation permitting decisions to grant or deny a parade permit to be made on "the public welfare, peace, safety, health . . ."). In Miami, permission to engage in core expressive activity is left to the "whim of the administrator."

### (2). The Miami Code fails to leave open ample alternatives for communication of expression

It is a cardinal rule of First Amendment law that "[the] streets [and sidewalks] are natural and

proper places for the dissemination of information and opinion; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Thornhill*, 310 U.S. at 105-106 [citations omitted] [second bracketed edit supplied]. The Miami Code does not allow for ample alternatives for communication of core expression within the City. If, if in the unrestrained view of Miami officials, an individual or group does not submit a permit application sufficiently in advance of the intended expressive activity, or a permit is denied based on an "unfavorable recommendation," the speaker is foreclosed from all public fora in the City. Because a permit is required for any expressive activity – no matter how few people are involved – if it might "obstruct" a public sidewalk to any degree, there is no other place in the City to engage in such protected expression without first obtaining a permit.

The lack of ample alternatives, let alone any alternative, is reinforced by looking at the City's park permit scheme that is equally, if not more, restrictive than the street and sidewalk provisions challenged by this action. Section 38-67 of the Miami Code provides that:

> No speeches or demonstrations . . . parades . . . , or similar activity shall be allowed in any park unless a permit is obtained in advance from the parks and recreation department. Such permit shall define the nature of the activity and set forth limitations as to hours, attendance and equipment to be used, along with any other restrictions deemed necessary.

The City's park permit ordinance is so sweeping that a solitary speaker would need a permit to stand in a public park in the City of Miami to preach the imminent end of the world, and four people gathered to protest FTAA arrests would violate the ordinance if they did not first obtain a permit. There is no question that a license would be required from Parks and Recreation for the type of expressive activities plaintiffs have engaged in and plan to continue to engage in within the City. Section 38-75 lists the activities for which permits are required, including specifically: "(1) Making speeches or giving lectures, . . . (f) holding a rally, (g) having a parade, . . . [or] (l) [a]ny other activity

15

similar to those listed." Exhibit 5, pp. 3,4.[6]

### C. The Ban on "Obstruction" is Impermissibly Vague and Overbroad as It Restricts Protected Expressive Activity in Quintessential Public Fora

In *Cox v Louisiana,* 379 US 536 (1965), the United States Supreme Court overturned the convictions of college students engaged in civil rights protests who were arrested for protesting the earlier arrests of fellow students.  Two thousand students assembled peaceably at the state capitol building and marched from there to the courthouse where the earlier arrestees were being held.  With official permission, but without a permit, they assembled on the sidewalk across the street from the courthouse and, in an orderly manner, rallied and marched.  They were arrested when they failed to disperse pursuant to a police order that they had exceeded their time for demonstrating. Cox alleged that his arrest and conviction for obstructing a sidewalk violated his rights of speech and assembly as he had engaged in nothing other than peaceful protest.

The Supreme Court agreed with Cox that the Louisiana statute, as construed by the state Supreme Court, was unconstitutionally broad and would allow punishment merely for peacefully demonstrating while expressing disfavored views.  The Court also held that Cox's conviction under a statute prohibiting obstruction of public sidewalks was an indefensible violation of his freedom of speech and assembly where the "obstruction" ordinance was coupled with the unfettered discretion of local officials to regulate the use of streets for peaceful parades and assemblies.

Miami has applied this ordinance to arrest as few as four people standing on a street corner for a major intersection during the FTAA protests.  Ex. 6, p.3.  Under Miami's rule, Cox would be subject to the same unlawful arrest if he conducted his protest across from the Miami courthouse.

---

[6]   Section 38-75 is also unconstitutional as it, too, imposes liability for the conduct of third parties and requires a permittee to assume all risk for an event, no matter what the cause of an injury. Exhibit 5, p. 4.  *See* Section III.D., *infra*, at p. 17.

**D.    The Miami Code Impermissibly Conditions a Permit on Compelled Liability for Potentially Tortious Conduct of Third Parties, Including Government Officials**

As a "condition precedent" to obtaining a permit, Section 54-3(b) mandates that the applicant agree in advance to assume all risk and liability for anything that may happen in conjunction with the permitted event.  Miami makes the right to engage in free speech dependent upon an applicant's agreement to be responsible not only for its own possible wrongful conduct, but on that of third parties over whom the permittee may have no control, including hostile onlookers and the police. This "condition precedent" runs afoul of the First Amendment.

The First Amendment does not permit the imposition of tort liability for expressive activities merely because an individual or group organizes a protest, picket, parade or other constitutionally protected expressive activity.   In light of *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 931 (1983), assumption of the risk or liability as a condition for the issuance of a permit to engage in First Amendment activities cannot stand. *Claiborne* held that tort liability could not be imposed on the exercise of First Amendment rights absent a showing that the individual sought to be held liable had personally engaged in, directed, condoned or ratified unlawful activity. *Id.*, at 908.

For the same reason, Miami's "condition precedent" cannot stand.  The First Amendment rights of plaintiff and other prospective applicants may not be preconditioned on assumption of liability for the possible wrongdoing of some persons who are present, whether as participants, hecklers, or police, a liability they could not incur under the First Amendment.

**E.    Section 54-6.1 is Unconstitutional as Applied to Limit "Public Assemblies" Outside a Structure to No more than 30 minutes**

Defendants have applied Section 54-6.1 to restrict "public assemblies" of any size to no more than 30 minutes.  Exhibit 6, pp. 1,2,4,5,6.  This interpretation of the ordinance is inconsistent with the plain language of the provision and inconsistent with First Amendment principles that require

17

reasonable time, place and manner regulations for expressive activities in public fora.

### 1.    Section 54-6.1 is not a reasonable time, place or manner regulation

Section 54-6.1 is unconstitutional as a content-based, seriously underinclusive regulation. It is content-based because its applicability turns on whether those assembled share a "common purpose." Officials, necessarily, must assess whether each person assembled is there to "speak" about the same issue. There is simply no fit with any of the City's asserted interests in regulating demonstrations. *See*, Exhibit 2, pp. 1-2. If two or more groups of demonstrators assemble outside a structure, each group with a common purpose but one that is different from that of the other group(s), and each group consists of no more than seven persons, far more than eight people may assemble in the same area without invoking the provisions of § 54-6.1.

### 2.    54-6.1 is unconstitutional as applied to limit assemblies to 30 minutes

Although the definitional sections of 54-6.1 are hardly a model of grammatical structure, clearly, the 30-minute provision in 54-6.1(a) is not a temporal limitation on public assemblies, but a threshold for invoking Section 54-6.1(b). It means that when eight or more people assemble for longer than 30 minutes outside a structure, they may not possess certain items. This is the only construction of this section that 1) makes sense and 2) avoids the need for this Court to decide the facial constitutionality of a blanket 30-minute limit on the right to assemble in public places outside of a structure. *See Public Citizen v. Department of Justice*, 491 U.S. 440, 465 (1989) ("Even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (citation omitted). Yet defendants have applied this provision to restrict all public assemblies of eight or more outside a structure to no more than 30 minutes. There is no significant government interest that is furthered by such a blanket rule and the City has not asserted an interest that would support

18

such an interest. *See* Exhibit 2, pp. 1-2. "[A] valid time . . . restriction must be . . . time-specific to pass constitutional muster." *Leonardson v. City of East Lansing*, 896 F.2d 190, 1999 (6th Cir. 1990). "Time-specific" means that expressive activities are allowed or banned at certain times of day, not that no assembly of eight or more may last longer than 30 minutes.

## IV.  THE OTHER STANDARDS FOR THE GRANTING OF THE MOTION ARE MET

### A.  The Plaintiff Will Suffer Irreparable Injury:

The irreparable injury to plaintiff in this instance is clear. So long as defendant City's ordinance is in effect, and as long as the defendants have unbridled discretion to decide whether or not to issue a permit for protected expressive activity, plaintiff suffers the threat of imminent denial of its First Amendment rights to free expression and assembly. Moreover, if defendants are not enjoined from applying Section 54-6.1 to limit a sweeping category of "public assemblies" to no longer than 30 minutes, plaintiffs lose the ability to exercise their First Amendment rights in a meaningful manner. Thus, plaintiff is forced to choose between its constitutionally-protected right of free speech and assembly and avoiding criminal prosecution. It is well established that "[t]he loss of First Amendment freedoms, for even minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). *See also* 11 Wright & Miller, *Federal Practice & Procedure*, § 2948, at 440 (1973) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").

### B.  The Balance of the Hardships Favors the Plaintiff

There is no serious doubt that the balance of hardships tips in plaintiff's favor. In contrast to the harm plaintiff will suffer if a restraining order is not granted, defendant City will not suffer any injury if it is prevented from enforcing unlawful restrictions on the exercise of First Amendment rights. Defendant City is still free to enforce the general criminal laws such as disorderly conduct,

blocking vehicular traffic, etc., if plaintiff's <u>conduct</u> goes beyond the bounds of the First Amendment.

**C.    A Temporary Restraining Order/Preliminary Injunction Is Not Adverse to the Public Interest**

A temporary restraining would not be adverse to the public interest here. To the contrary, "it is always in the public interest to prevent the violation of a party's constitutional rights." *G&V Lounge v. Michigan Liquor Control Commission*, 23 F.3d 1071, 1079 (6th Cir. 1994). *Accord, Iowa Right to Life Committee v. Williams*, 187 F.3d 963, 969 (8th Cir. 1999). "The public has an interest in the protection and preservation of *First Amendment* rights. 'Vindication of First Amendment rights is in the public interest.'" *McIntire v. Bethel School. Independent School District No. 3*, 804 F.Supp. 1415, 1429 (W.D. OK 1992) [internal citation omitted].

## CONCLUSION

For all of the foregoing reasons, plaintiff requests that a temporary restraining order issue to enjoin enforcement of Miami Code sections 54-2, 54-3, 54-6 and 54-6.1.

DATED:  February 3 , 2004                         Respectfully submitted,

By:      ROBERT W. ROSS, JR., FBN 921660

LAW OFFICES OF ROBERT W. ROSS, JR.
601 South Federal Highway
Lake Worth, Florida 33460
T. 561 251-4896

Carol A. Sobel (Pro Hac Vice)            Andrea Costello    FBN 532991
LAW OFFICE OF CAROL A. SOBEL            Alice K. Nelson    FBN 211771
429 Santa Monica Boulevard, Suite 550  SOUTHERN LEGAL COUNSEL, INC.
Santa Monica, California 90401          1229 N.W. 12th Avenue
T. 310 393-3055; F. 310 393-3605        Gainesville, Florida 32601
                                        T. 352 271-8890;   F. 352 271-8347

## DECLARATION OF CARA JENNINGS

I, CARA JENNINGS, declare:

I am a member of Lake Worth for Global Justice group ("Group"). I am of age. I have personal knowledge of the facts set forth below.

1.    Plaintiff Lake Worth for Global Justice is an incorporated association in the state of Florida. The group is an activist collective committed to taking action for social justice. We are located about 60 miles north of Miami. We participated as a collective in the FTAA protests in Miami and continue to be engaged in the post-FTAA demonstration issues. We are involved in ongoing trade economic justice issues arising in Miami. During the recent FTAA protests in south Florida in November, members of our collective were stopped in Miami by the police, detained and searched. Members of the group participated in various demonstrations during the FTAA and were subject to orders to disperse when they engaged in lawful activities, including the events outside the amphitheater following the AFL-CIO sponsored march on Thursday, November 20, 2003, and the jail solidarity vigil and rally on November 21, 2003. Both events were the subject of orders to disperse, without proper notice to disperse, and police use of less-lethal weapons and tear gas and arrests of demonstrators. I and other members of our group repeatedly observed the police tactics during the FTAA protests. In addition, although none of the members of our collective were arrested, I am aware that individuals with whom we regularly work in the global justice movement were arrested in the anti-FTAA protests solely for being a part of public demonstrations or failure to obey an order to disperse. Several persons who I became acquainted with when they assisted our group to make the large puppets used in the Miami anti-FTAA demonstrations were also arrested.

2.    Lake Worth for Global Justice intends to participate in protesting the police actions at the FTAA and, specifically, plans to engage in lawful protests outside City Hall, where the

Civilian Investigation Panel (CIP) is scheduled to hear testimony from Police Chief Timoney on Thursday night, February 5, 2004. We want to participate in a protest outside City Hall during the entire time of the hearings, which are scheduled to begin at 5 p.m. and last for several hours. *Id.*

3.    We plan to stand on the sidewalk and the adjacent grassy area, hold signs, and utilize the large puppets we bring to most protests. I participated in a press conference regarding the scheduled FTAA protests in this same general area outside Miami City hall shortly before the FTAA meeting in November. Some members of our collective also plan to participate in a demonstration on the sidewalk adjacent to Bay Shore Drive. Because the Miami City Hall is located down a long drive and apart from Bay Shore Drive, if the demonstration is restricted to the area outside of City Hall, our message cannot be communicated to the general public. We want to be able to reach with our message both those people entering and leaving City Hall at the time of the CIP hearing and the general public traveling on Bay Shore Drive.

4.    In the wake of the police response to the FTAA demonstrations, various individuals and organizations came together to form a coalition to protest the police tactics used to break up demonstrations and arrest anti-FTAA protestors. Although our group has not joined this coalition, we expect many individuals associated with it to be present at the CIP hearings to protest Chief Timoney's appearance. Lake Worth for Global Justice expects that more than eight people will be present outside City Hall on the evening of February 5th with the common purpose of expressing criticism of Chief Timoney and the Miami police. Our group expects that those assembled will, by standing in this area, and on the sidewalk adjacent to Bay Shore Drive, possibly block a portion of the sidewalks, obstructing some pedestrian passage. We plan to stand outside City Hall and on the sidewalk adjacent to Bay Shore Drive for more than 30 minutes as the previous hearing by the CIP regarding the FTAA protests lasted for several hours and the hearing on February 5th is likely to last

a similar length of time.

    5.      Lakeworth Global Justice has not filed for a permit for the February 5 demonstration outside the CIP meeting at City Hall or on the sidewalk adjacent to Bay Shore Drive.  It is our understanding that no other group has applied for a permit for this event.  I am aware of the Miami Code sections requiring a permit and, based on my understanding of these sections, do not know how long in advance of this event someone should have filed for a permit to obstruct a portion of the sidewalk.  I also understand that a condition of obtaining a permit is that we agree in advance to assume the risk and all liability arising from the permitted activities.  Our group is unwilling to do this and is concerned that, if we signed such a permit requirement, we would be held financially responsible not only for any intentional acts our members engage in as part of the group's plan, but for the negligent and intentional acts of participants in the protest who act outside of the agreed upon expressive activities, as well as the negligent and intentional acts of possible counterdemonstrators and the police.  If we must sign such an agreement to obtain a permit to engage in First Amendment activities in Miami, we would not do so because of the risk of financial ruin.  In particular, if we signed such an agreement and the police shot people again with "rubber bullets," sprayed them with various chemical irritants, beat the demonstrators with batons and arrested them, we would be agreeing in advance to indemnify the City for those wrongful acts.

    6.      Even if we understood what we had to do and how long in advance we had to file for a permit, we still would not apply for a permit because of the insurance requirements.  We could not afford to post liability insurance in the amounts set forth in the ordinance.  As I understand the Miami permit requirements, if ten members of our group wanted to demonstrate on a public sidewalk with the large puppets we use as part of our expressive activities, we would need a permit because we would certainly block part of the sidewalk, although most of the sidewalk would still be

unobstructed.  But we would need to provide proof of insurance of $50,000 for each participant for a total of $500,000.00.  We cannot afford that and we do not have insurance that would cover this.

7.     Lake Worth Global Justice intends to engage in other demonstrations and expressive activities in the City of Miami in the coming weeks and months as part of its anti-globalization and social justice work.  Our group anticipates that some of these expressive activities will be targeted to the ongoing campaign to redress the police abuse during the FTAA meeting in November 2003.  We are concerned that we will need permits for these activities or that we will otherwise be subject to termination of our expressive activities and possible arrest for violating Chapter 54 of the Miami Municipal Code.


I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.  Executed on February 2, 2004 at **LAKE WORTH**    , Florida.


CARA JENNINGS

EXHIBIT 1



# Miami: Code

Email Us | Refresh Code | Print | F.A.Q. | Help

**Single Word Search:** [                    ]  [ Search ]  *Advanced Search*

Show Table of Contents |Views |Frames

Previous Page                                                                    Next Page

CHARTER AND CODE City of MIAMI, FLORIDA Codified through Ord. No. 12379, enacted June 12, 2003.
(Supplement No. 22)
    Chapter 54 STREETS AND SIDEWALKS*
      ARTICLE I. IN GENERAL

---

## ARTICLE I.  IN GENERAL

### Sec. 54-1.  Obstructions generally.

Any person who, after notice to disperse, shall stand or gather upon any sidewalk in this city in such a way as to obstruct the passage of persons along such sidewalk shall, upon conviction, be punished as provided in section 1-13. No auctioneer, commission merchant or other merchant shall be allowed to obstruct any sidewalk or street for the purpose of selling, vending, showing or disposing of his wares or merchandise or of delivering the same, nor shall any assembly of persons be assembled for the bidding of the same so as to obstruct the free passage of the sidewalk or street.

(Code 1967, § 54-1; Code 1980, § 54-1)

**City Code cross references--**Advertising which obstructs streets or sidewalks, § 54-10; obstructing streets with materials during construction of sidewalks, curbs, etc., § 54-49; obstructing streets or sidewalks with trash, lumber, etc., § 54-57.

### Sec. 54-2.  Obstruction of free passage on sidewalks, etc.

(a)    *Purpose.* It is the intent of this section to eliminate the obstruction of free passage over, on or along a street or sidewalk, which obstruction results from the manner in which a person or number of persons shall stand, loiter or walk on said street or sidewalk.

(b)    *Prohibited behavior.* It is unlawful for any person or any number of persons to so stand, loiter or walk upon any street or sidewalk in the city so as to obstruct free passage over, on or along said street or sidewalk after a request by a law enforcement officer to move on so as to cease blocking or obstructing free passage thereon.

(c)    *Applicability.* The provisions of subsection (b) hereof apply only when a person or number of persons shall stand, loiter or walk on a street or sidewalk so as to obstruct free passage and shall refuse to obey a request by an officer to move on; mere refusal to move on after a law enforcement officer's request to move on is not enough to support the offense. There must be an actual blocking of free passage over, on or along said street or sidewalk.

(Ord. No. 9241, §§ 1, 2, 2-11-81; Code 1980, § 37-53.1)

### Sec. 54-3.  Permit required to obstruct or close street or sidewalk or impede traffic; fees; waiver of fees.

(a)    No person shall obstruct, close, or cause to be obstructed or closed any street or sidewalk in this city or impede the general movement of vehicular or pedestrian traffic without first having obtained a permit from both the police and fire-rescue departments. In the case of special events and festivals, an additional

permit must also be obtained prior to the event/festival from the department of public works. The departments of police, fire-rescue and, if applicable, public works, shall issue such permits only after approval for permit issuance has been granted by the city manager, or his/her designee, said approval contingent upon favorable recommendation by said departments for the issuance of said permits.

(b)   Such permit shall set forth minimal reasonable conditions necessary for the protection of property and personal safety. Willful violation of the conditions set forth shall render such permit null and void.

(c)   It shall be a condition precedent to the issuance of any such permit that the applicant shall assume all civil liability for his acts of omission or commission and shall, further, hold the city harmless for any acts arising or resulting from the issuance of said permit and any omissions or commissions on the part of the city. The applicant shall insure that adequate safety precautions are in effect at all times during the term of the permit. Prior to the issuance of any such permit, the applicant shall submit to the city a certificate binder or policy of liability insurance in an amount not less than $50,000.00 per person, $100,000.00 aggregate, or the amounts specified as a limit of liability set forth in F.S. § 768.28, whichever is greater, which shall include the city as an additional insured and which shall provide that it will remain in full force and effect during the term of the permit.

(d)   Fees.

(1)   *General.* A fee of $100.00 shall accompany each permit application to the police department, to be retained by the city regardless of action taken in the grant or denial of the permit.

(2)   *Special events and festivals.* A fee of $0.25 per day per linear foot of street obstructed by the event/festival shall accompany each permit application to the department of public works for the use of the public right-of-way. The linear footage shall be calculated by the department of public works utilizing the city's officially established monument lines.

(3)   *Waiver of fees.* The fees described in subsections (d)(1) and (2) hereinabove may be waived or reduced by the city commission if the commission determines that such a waiver or reduction is in the city's best interest.

(Code 1967, § 54-3; Ord. No. 8995, 1, 10-17-79; Ord. No. 9532, § 1, 12-9-82; Ord. No. 10658, § 3, 10-12-89; Ord. No. 11045, § 4, 3-11-93; Code 1980, § 54-3; Ord. No. 11276, § 3, 7-13-95)

## Sec. 54-4. Closing and vacating of streets.

(a)   When any owner of property abutting any public street or alley located within the city wishes to close such street or alley or any portion thereof, he shall file in the office of the clerk of the circuit court in and for the county a record plat of the property through which passes the street or alley or portion thereof which is sought to be closed, such plat to show the alley or street or portion thereof as being closed and to include all property abutting thereon except as provided in subsection (b) below.

(b)   The record plat required by this section shall be prepared and executed in accordance with the laws of the state and with the rules and regulations of the public works department, and shall be signed and executed by the owners of all the abutting property, including but not limited to, those property owners abutting streets or alleys sought to be vacated and closed. Provided, however, execution by property owners abutting streets or alleys sought to be vacated and closed is not required when the applicant: (a) provides suitable access easement(s), (b) provides an indemnification, hold harmless and agree to defend affidavit to the city, in a form acceptable to the city attorney (c) provides a bond acceptable to the city's risk manager to be effective throughout the applicable statute of limitations, (d) pays for the cost and expense of written notices, United States First Class Return Receipt Requested, and public hearings and (e) otherwise fully complies with the requirements of section 55-15 of this code. The record plat shall also be signed and executed by any persons holding any mortgage, lien, judgment or other interest in the street or alley. Notwithstanding the foregoing, governmental agencies may consent to, rather than execute the actual plat.

(c)   From and after the filing of the plat required by this section, the alley, street or portion thereof shall be closed, abandoned and discontinued as a public street or alley, provided that such closing, abandonment, or discontinuance shall not in any manner affect utility equipment or services already installed in the alley, street or portion thereof, or the right to thereafter maintain and operate the equipment and services in the

alley, street or portion thereof during the term of the franchise under which the equipment and services were installed in the alley, street or portion thereof.

(Code 1967, § 54-4; Code 1980, § 54-4; Ord. No. 12140, § 1, 10-25-01)

## Sec. 54-5.  Removing material from streets.

No person shall dig up or scrape up and carry away any gravel, dirt, rocks or sand from any street, lane or alley in the city, without the permission of the proper authority of the city.

(Code 1967, § 54-5; Code 1980, § 54-5)

## Sec. 54-6.  Permit required for parades and processions.

(a)    No procession or parade, except a procession or parade of the forces of the United States armed services, the military forces of this state and the forces of the police and fire-rescue departments, shall occupy, march or proceed along any public street, roadway or public property except in accordance with a permit issued by the chief of police and with such other applicable regulations as are set forth in this Code. The chief of police shall issue such permit only after the approval for such issuance is given by the city manager, or his designee, following his receipt of a recommendation for action upon the issuance of such permit by the chief of police.

(b)    The written application for such permit shall be filed with the chief of police on a form approved by him sufficiently in advance of the proposed parade or procession to allow adequate arrangements to be made for the proper policing of same. The application shall contain the following:

 Previous Page

Next Page

Ex. 1/3



# Miami: Code

Email Us | Refresh Code | Print | F.A.Q. | Help

**Single Word Search:** [                    ]  [ Search ]  *Advanced Search*

Show Table of Contents |Views |Frames

🔲 Previous Page                                                          Next Page 🔲

CHARTER AND CODE City of MIAMI, FLORIDA Codified through Ord. No. 12379, enacted June 12, 2003. (Supplement No. 22)

Chapter 54 STREETS AND SIDEWALKS*

ARTICLE I. IN GENERAL

Sec. 54-6. Permit required for parades and processions.

(1)    The name of the applicant, the sponsoring organization, the parade or procession chairman, and the addresses and telephone numbers of each.

(2)    The purpose of the parade or procession, the date when it is proposed to be conducted, the location of the assembly area, route to be traveled and the approximate time when the parade, procession or motorcade will assemble, start and terminate.

(3)    A description of the individual floats, marching units, vehicles, bands, if any, including a description of any sound amplification equipment to be used.

(4)    Such other information as the chief of police may deem reasonably necessary.

(c)    Such permits shall set forth conditions reasonably necessary for the protection of the rights, property and personal safety of all parties. Failure to substantially fulfill the conditions set forth in such permit shall render such permit null and void.

(d)    Upon issuance of such permit, the police department shall provide police services adjacent to the permit area to regulate vehicular and pedestrian traffic, conditioned upon the availability of a sufficient contingent of on-duty personnel to provide such services without diminishing routine service levels to the entire community. The on-duty contingent shall be supplemented by the number of off-duty officers providing special police service as required and authorized pursuant to chapter 42 of this Code.

(e)    By applying for and being granted such permit, the applicant shall assume all civil liability arising from conditions, restrictions or omissions on the face of the permit.

(f)    Payment of a nonrefundable fee of $30.00 for the administrative costs involved in the processing of the herein parade or procession permit application shall accompany the filing of the permit application and shall remain in the general revenues of the city without regard to the final action taken by the city manager or his designee.

(Code 1967, § 54-6; Ord. No. 8997, § 1, 10-17-79; Ord. No. 9533, § 1, 12-9-82; Code 1980, § 54-6)

## Sec. 54-7. Political or other advertisements not to be placed on city property or trash receptacles.

It shall be unlawful to place political advertisements, handbills or snipe signs or billboards on city-owned property and trash receptacles placed upon city streets and sidewalks.

(Code 1967, § 38-42; Code 1980, § 37-56)

**State law references:** Authority of local governments to establish sign ordinances, F.S. §§ 106.1435, 166.0425, 479.155.

## Sec. 54-8. Using street or sidewalk for display purposes, exceptions; permit and

EXHIBIT 2

.Title

### *SUBSTITUTE - COMMUNITY RELATIONS BOARD 11-04-03*

AN ORDINANCE OF THE MIAMI CITY COMMISSION, AMENDING CHAPTER 54 OF THE CODE OF THE CITY OF MIAMI, FLORIDA, AS AMENDED, ENTITLED "STREETS AND SIDEWALKS" TO ESTABLISH REASONABLE TIME, PLACE AND MANNER REGULATIONS CONCERNING MATERIALS AND OBJECTS THAT MAY BE POSSESSED, CARRIED OR USED BY THOSE PARTICIPATING IN PARADES AND PUBLIC ASSEMBLIES; MORE PARTICULARLY BY ADDING NEW SECTION 54 6.1 TO SAID CODE; CONTAINING A REPEALER PROVISION, A SEVERABILITY CLAUSE, AND PROVIDING FOR AN IMMEDIATE EFFECTIVE DATE.

..Body

WHEREAS, the City's current parade regulations, which govern parades, demonstrations, rallies and assemblies, were enacted more than twenty years ago; and

WHEREAS, the statutory and judicial laws governing parades, demonstrations, rallies and assemblies have developed and are significantly different than law as it existed at the time of enactment; and

WHEREAS, current technology, communication and materials available have altered the manner in which such events occur, and the nature and level of the activity of those participating in such events have changed significantly since the enactment of the current regulations; and

WHEREAS, in recent years, civil unrest and disturbance have occurred at parades and assemblies, accompanied in some instances by significant personal injuries and property damage, including injuries and damage caused by the use of various weapons and projectiles including some or all of those items specified in Section 2 of this Ordinance; and

WHEREAS, courts have recognized the right of jurisdictions to enact reasonable time, place and manner restrictions related to parades, demonstrations, rallies and assemblies while protecting the First Amendment rights of groups and individuals wishing to express their views by such demonstrations, rallies and assemblies; and

WHEREAS, the regulations of the City of Los Angeles restricting the size, nature and shape of sign handles were recently upheld by the Ninth Circuit Court of Appeal. See:  Vlasak v. Superior Court, 329 F.3d 683 (9th Cir. 2003).  See also: Edwards v. City of Coeur D'Alene, 262 F.3d 856 (9th Cir. 2001); Foti v. City of Menlo Park, 146 F.3d 629 (9th Cir. 1998); and

WHEREAS, the City of Miami wishes to ensure the safety and security of those viewing, attending, or participating in parades and assemblies, the residents and businesses, and the public officials and employees responsible for handling or overseeing such events on public property in the City of Miami to reduce or avoid the possibility of personal injury and property damage; and

Ex. 2/1

WHEREAS, the City of Miami recognizes the First Amendment rights of those wishing to express their views, both individually and collectively, on issues addressed at or in future parades, protests, demonstrations, rallies; and

WHEREAS, it is appropriate for the City Commission to enact regulations relating to parades and assemblies to ensure the safety and well-being of individuals and property, while ensuring the First Amendment rights of those wishing to associate and to express their views, both individually and collectively; and

WHEREAS, it is the purpose and intent of the City of Miami, in enacting the regulations set forth in Section 2 of this Ordinance, to establish reasonable time, place and manner restrictions for parades and assemblies to ensure the safety and well-being of individuals and property, while at the same time ensuring the First Amendment rights of those wishing to associate and to express their views, both individually and collectively; and

WHEREAS, in enacting these regulations, the City is cognizant of recent court decisions that authorize the enactment of reasonable time, place and manner restrictions, and the City is also cognizant of its obligation not to improperly restrict the First Amendment rights of individuals and groups wishing to associate and to express their First Amendment views on any and all issues, and to do so in a robust, vigorous manner; and

WHEREAS, the regulations in Section 2 of this Ordinance restrict only the types of materials that those participating in parades, demonstrations, rallies and assemblies may have in their possession, and do not interfere with their rights of association and expression; and

WHEREAS, the materials restricted or prohibited by Section 2 of this Ordinance have the potential to be used as weapons and to inflict personal and property damage, or to provide protection by preventing permitted law enforcement controls related to those participating in the use of such weapons and the infliction of personal and property damage, and the materials have been used for this purpose in events in other jurisdictions; and

WHEREAS, it is therefore, reasonable and appropriate to restrict possession of certain materials as a reasonable time, place and manner regulation;

NOW, THEREFORE, BE IT ORDAINED BY THE COMMISSION OF THE CITY OF MIAMI, FLORIDA:

Section 1.          The recitals and findings contained in the Preamble to this Ordinance are adopted by reference and incorporated as if fully set forth in this Section.

Section 2.          Chapter 54 of the Code of the City of Miami, Florida, as amended, entitled "Streets and Sidewalks" is amended in the following particulars:{1}

"CHAPTER 54

STREETS AND SIDEWALKS

ARTICLE I.  IN GENERAL

&ast;          &ast;          &ast;          &ast;          &ast;

Sec. 54-6.1.  Parade and Assembly Prohibitions

(a)              Definitions.

The term "Parade" shall mean a coordinated movement of seven (7) or more pedestrians or vehicles upon the streets, within the city with an intent of attracting public attention that interferes with or has a tendency to interfere with the normal flow or regulation of traffic upon the street .

The term "Public Assembly" shall mean a gathering outside a structure of more than eight  (8) persons for a common purpose at a public place that continues in existence for more than thirty (30) minutes.

(b)     The following prohibitions shall apply to all parades and public assemblies:

1.     It shall be unlawful for any person at any parade or public assembly to carry or possess any weapon, as defined below. For purposes of this chapter, and notwithstanding any other provision of this code, "weapon" means any pistol, rifle, shotgun or other firearm of any kind, whether loaded or unloaded, air rifle, air pistol, paintball gun, paintball rifle, explosive, blasting cap(s), knife, hatchet, ax, slingshot, slungshot, blackjack, metal knuckles, mace, iron buckle, ax handle, chains, crowbar, hammer, shovel, or any club or bludgeon or any other instrumentality used or intended for use as a dangerous weapon.

2.     It shall be unlawful for any person to carry or possess any sign, poster, plaque or notice unless such sign, poster, plaque, or notice is constructed solely of a cloth, paper, flexible or cardboard material no greater than one-quarter inch in thickness.

3.     It shall be unlawful for any person to carry or possess any length of lumber, wood or wood lath unless it is one-fourth inch or less in thickness and two inches or less in width or if not generally rectangular in shape, such object shall not exceed three-quarters inch in its thickest dimension.  Both ends of the length of lumber, wood or wood lath shall be blunt and shall not be pointed. Exceptions from this section include 1) lumber or wood used to support or control puppets, so long as the lumber or wood is not detached from the puppets and 2) stilts, defined as two poles with footrests off the ground on which someone balances or walks so long as each stilt does not exceed fifteen (15) feet in length and two by two (2X2)  inches in width.

Ex. 2/3

4.      It shall be unlawful for any person to carry or possess any length of metal, plastic or other similar hard of stiff material, whether hollow or solid; provided that hollow plastic does not exceed three-quarter (3/4") inch in its thickest dimension, does not exceed one-eighth inch (1/8") in wall thickness and is not filled with any material, liquid, gas or solid, may be used to support a sign, banner, placard or other similar display; however, both ends of the length of plastic material shall be blunt, and not pointed.

5.      It shall be unlawful for any person to carry or possess glass bottles, glass jars or glass containers of any kind unless such glass container is a vial required to hold medication customarily stored in a glass vial.

6.      It shall be unlawful for any person to carry or possess balloons filled with any material or substance other than air, oxygen or helium.  Such materials and substances include, but are not limited to, water, paint, or any other liquid, solid, or other gas.

7.      It shall be unlawful for any person to carry or possess bricks, stones, rocks, or pieces of asphalt or concrete. No person may carry or possess with the intent to unlawfully use any hard materials or substances or pieces of hard materials or substances that are capable of being thrown or projected.

8.      It shall be unlawful for any person to carry or possess spray paint cans.

9.      It shall be unlawful for any person to carry or possess any projectile launcher or other device which is commonly used for the purpose of launching, hurling or throwing any object, liquid, material or other substance, including, but not limited to, supersoakers and watercannons. Nothing in this subsection is intended to prohibit or restrict those participating in parades, demonstrations, rallies or assemblies from possessing sufficient amount of water or other liquids designed and intended for human consumption during such events.

10.      It shall be unlawful for any person to carry or possess any so called Sleeping Dragon Device, with the intent to use the device to deny or obstruct the public's ability to freely move about on roadways, sidewalks, or into or out of buildings.  For purposes of this subsection, a Sleeping Dragon Device shall mean a section of pipe, or a container, filled with weighted material, handcuffs, chains, carabiners or other locking devices used to lock a person or persons to another person or persons or other objects.

Nothing in this section shall prohibit a disabled person from carrying, possessing or using a wheelchair, cane, walker, or similar device necessary for providing mobility so that the person may participate in a parade.

Nothing in this section is intended to authorize the possession or use of materials, weapons or devices that are otherwise prohibited by any other local, state or federal ordinance, statute or regulation.  The purpose of this section is to prohibit the carrying or possession of items and materials that have the potential to

be used as weapons to cause physical or personal damage, and whose possession
might not otherwise be prohibited by local, state or federal law.

        *        *        *        *        *

Section 3.        All ordinances or parts of ordinances insofar as they are
inconsistent or in conflict with the provisions of this Ordinance are repealed.

Section 4.        If any section, part of section, paragraph, clause, phrase
or word of this Ordinance is declared invalid, the remaining provisions of this
Ordinance shall not be affected.

Section 5.        This Ordinance shall become effective IMMEDIATELY
after final reading and adoption thereof.{2}

PASSED ON FIRST READING BY TITLE ONLY this _____ day of
_____, 2003.

PASSED AND ADOPTED ON SECOND AND FINAL READING BY TITLE
ONLY this _____ day of _____, 2003.


APPROVED AS TO FORM AND CORRECTNESS:



_____
ALEJANDRO VILARELLO
CITY ATTORNEY


**..Footnote**


{1} Words and/or figures stricken through shall be deleted.  Underscored words
and/or figures shall be added.  The remaining provisions are now in effect and
remain unchanged.  Asterisks indicate omitted and unchanged material.

{2}     This Ordinance shall become effective as specified herein unless vetoed by
the Mayor within ten days from the date it was passed and adopted.  If the Mayor
vetoes this Ordinance, it shall become effective immediately upon override of the
veto by the City Commission or upon the effective date stated herein, whichever is
later.

EXHIBIT 3



# Miami: Code

Email Us | Refresh Code | Print | F.A.Q. | Help

**Single Word Search:** [ _____ ] [ Search ]  *Advanced Search*

Show Table of Contents |Views |Frames

Previous Page                                                      Next Page

CHARTER AND CODE City of MIAMI, FLORIDA Codified through Ord. No. 12379, enacted June 12, 2003. (Supplement No. 22)
Chapter 1 GENERAL PROVISIONS
Sec. 1-13. General penalty.

## Sec. 1-13.  General penalty.

Any person violating the provisions of any section of this Code or any other ordinance, where no other penalty is prescribed, shall, upon conviction, be fined not more than $500.00, or be imprisoned at hard labor on the streets or other works of the city for not more than 60 days, or shall be both fined and imprisoned. Each day that such violation shall continue (or, in the case of shows and exhibitions illegally conducted, each performance) shall constitute a separate offense.

(Code 1967, § 1-6; Code 1980, § 1-6)

**Charter references:** Authority to impose penalties for ordinance violations, limitation on penalties, § 3(z).

**State law references:** Penalty for violation of ordinances, F.S. § 162.22; fines and forfeitures collected in county court for violations of municipal ordinances payable to municipality, F.S. § 34.191; punishment for misdemeanors, F.S. §§ 775.082, 775.083.

## Sec. 1-14.  Public clocks to use official time.

All clocks or other timepieces in or upon public buildings or other premises maintained at the expense of the city shall be set and run according to the official time as provided by the Congress of the United States, unless otherwise modified by the legislature of the State of Florida. It is hereby made the duty of the officer or other person having control and charge of such building or premises to see that such clocks or other timepieces are set and run in accordance with official time.

(Code 1967, § 1-8; Code 1980, § 1-7)

**Federal law reference--**Provisions establishing standard time throughout the United States, but permitting states to exempt themselves from daylight saving time, 15 USC 260--267.

**State law references:** Legal time, F.S. § 1.02.

## Chapter 2  ADMINISTRATION*

Ex. 3/1

EXHIBIT 4



# SPECIAL EVENTS APPLICATION

Date: _____

**Please print or type information**

## APPLICATION INFORMATION

1. **NAME OF APPLICANT**: _____
   ADDRESS: _____
   PHONE(S): _____ FAX: _____
   EMAIL ADDRESS: _____

2. **CONTACT PERSON, If different:** _____ **TITLE:** _____
   ADDRESS: _____
   PHONE: _____ FAX: _____
   E-MAIL ADDRESS: _____

3. **SPONSOR STATUS:**
   [  ] NOT FOR PROFIT ORGANIZATION   TAX EXEMPT NO: _____
   [  ] FOR PROFIT ORGANIZATION
   [  ] INDIVIDUAL
   [  ] CHARITABLE
   [  ] OTHER

4. **EVENT INFORMATION:**
   NAME OF EVENT: _____
   LOCATION (s): _____
   SET UP DATE(S) AND TIMES _____
   EVENT TEARDOWN DATES AND TIMES _____
   EVENT HOURS OF OPERATION: _____
   STREET CLOSURES DATES AND TIMES: _____

Ex. 4/1

5.  **SPECIFIC TYPE OF EVENT: (CHECK MORE THAN ONE BOX IF APPLICABLE)**

[ ] FESTIVAL                          [ ] FUNDRAISER

[ ] PARADE                            [ ] POLITICAL

[ ] FAIR/CARNIVAL                     [ ] RELIGIOUS

[ ] PRIVATE PARTY                     [ ] FILMING

[ ] SPORTS EVENT                      [ ] COMMUNITY EVENT

[ ] CONCERT/PERFORMANCE


NAME OF PERFORMER / BANDS: _____

_____

TYPE OF MUSIC:  [ ] POPULAR   [ ] CLASSICAL   [ ] LATIN   [ ] ROCK   [ ] OTHER

IF FUNDRAISER, NAME OF CHARITY RECEIVING FUNDS:

_____

_____


6.  **BRIEFLY DESCRIBE THE EVENT:**

_____

_____

_____

_____


7.  **ATTACH TENATIVE PRODUCTION SCHEDULE**

**(Attach as Exhibit A)**


8.  **ATTACH SITE PLAN (Sketch of set up, vendors, staging, parking area, security detail, etc)**

**(Attach as Exhibit B)**

_____

_____

_____

**9.  ESTIMATED ATTENDANCE**

Number of people _____

(Be specific, budget will be based on attendance)

Prior year attendance _____

**10. ESTIMATED MEDIA COVERAGE:**

Print:_____

Radio:_____

Television:_____

Internet:_____

Please describe marketing and promotional efforts for the event:_____

_____

**11.  IS THIS EVENT FREE TO THE PUBLIC?  [  ] YES   [  ] NO (IF NOT)**

Please state admission/entry fee   $ _____

**12.  WILL FOOD AND/OR BEVERAGES BE SERVED?  [  ] YES   [  ] NO**

|  | NO CHARGE | CHARGE | # OF VENDORS |
|---|---|---|---|
| [  ] FOOD | [  ] | [  ] | _____ |
| [  ] BEER | [  ] | [  ] | _____ |
| [  ] WINE | [  ] | [  ] | _____ |
| [  ] SOFT DRINKS | [  ] | [  ] | _____ |
| [  ] ARTS/CRAFTS | [  ] | [  ] | _____ |
| [  ] OTHER (SPECIFY) | _____ | | |

**NOTE:  BEVERAGES MUST BE DISPENSED IN SOFT CONTAINER.  NO GLASS
CONTAINERS OR CANS ALLOWED.**

Ex. 4/3

**13. PLEASE REVIEW THE FOLLOWING DETAILS FOR ALL VENDORS**

WILL VENDORS BE COOKING OR HEATING FOOD?  [  ] YES   [  ] NO

IF YES:

[  ] GAS                    CHARCOAL [  ]

[  ] ELECTRIC           OTHER [  ] (Specify) _____

**14. WHICH OF THE FOLLOWING ITEMS WILL BE UTILIZED:**

[  ] BOOTH (S)   # _____           SIZE(S)_____

[  ] TENT(S)         _____           _____

[  ] CANOPY        _____           _____

[  ] OTHER          _____           _____

**ABOVE MUST BE CERTIFIED NON-FLAMMABLE AND FURNISH COPY OF
CERTIFICATE TO FIRE DEPARTMENT**

**15. WILL YOU BE USING ANY OF THE FOLLOWING:  [  ] YES        [  ] NO**

[  ] FIRE WORKS                    [  ] MECHANICAL RIDES

DATE: _____            DATE: _____

TIME: _____            TIME: _____

PLACE: _____           PLACE: _____

COMPANY NAME: _____

INSURANCE CARRIER: _____

AGENT NAME: _____ TELEPHONE: _____

**NOTE:  ALL CARNIVAL, AMUSEMENT, OR CARNIVAL TYPE EVENTS SHALL
PROVIDE THE REQUIRED INSURANCE POLICY OF POLICIES AS STIPULATED BY
THE CITY OF MIAMI AND MUST GET PROPER PERMITS FROM BUILDING AND
ZONING DEPARTMENT.**

**16.  WILL YOU NEED THE FOLLOWING FROM THE PARKS DEPARTMENT:**

[  ] SHOWMOBILE (16'X 32')                    [  ] ELECTRICITY

[  ] PODIUM                                            [  ] BLEACHERS (seats 250)

[  ] PUBLIC ADDRESS SYSTEM

[  ] SPEAKERS

[  ] OTHER  (Specify) _____

**17. HOW DOES THIS EVENT BENEFIT THE CITY OF MIAMI. (QUANTIFY IF POSSIBLE)**

## INSURANCE INFORMATION

THE CITY OF MIAMI REQUIRES THAT ORGANIZERS OF SPECIAL EVENTS PROVIDE A CURRENT CERTIFICATE OF INSURANCE NAMING THE CITY OF MIAMI AS ADDITIONAL INSURED AND COMPLYING WITH SPECIFIED INSURANCE COVERAGES AND LIMITS AS PRESCRIBED BY THE CITY SEVEN (7) WORKING DAYS PRIOR TO THE CONDUCT OF ANY EVENT.  THE INSURANCE COMPANY MUST BE RATED "A" TO BE ACCEPTED.  LIABILITY LIMITS:  1 MILLION DOLLARS FOR GENERAL AND LIQUOR LIABILITY (IF NEEDED).

I.      Coverage: _____

II.     Insurance Company: _____

III.    Limits of Liability: _____

IV.     Agent: _____

V.      Agent's Phone Number: _____

VI.     Is the City named as an additional insured in this policy: _____

∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎

NOTE:  PLEASE ATTACH TO THIS APPLICATION A BUDGET SUMMARY TO INCLUDE ANTICIPATED EXPENSES AND REVENUES ASSOCIATED WITH THE EVENT.

∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎∎

_IT IS UNDERSTOOD THAT THE APPLICANT IS FINANCIALLY, ADMINISTRATIVELY AND PROGRAMMATICALLY RESPONSIBLE FOR ALL ASPECTS OF THE EVENT._

SIGNATURE:      _____

TITLE: _____     DATE: _____

Ex. 4/7

EXHIBIT 5

Case 1:04-cv-20262-DLG   Document 7   Entered on FLSD Docket 02/05/2004   Page 48 of 60

 **Municode**

# Miami: Code

Email Us | Refresh Code | Print | F.A.Q. | Help

**Single Word Search:** [_____]  [Search]  *Advanced Search*

**Show Table of Contents |Views |Frames**

Previous Page                                         Next Page

CHARTER AND CODE City of MIAMI, FLORIDA Codified through Ord. No. 12379, enacted June 12, 2003. (Supplement No. 22)
  Chapter 38 PARKS AND RECREATION*
    ARTICLE II. USE REGULATIONS
      Sec. 38-63. Disposal of trash.

---

(Code 1967, § 39-55; Code 1980, § 38-43; Ord. No. 11815, § 2, 7-13-99)

## Sec. 38-64.  Card games, bingo, raffles and similar activities.

No person or organization shall conduct raffles, bingo games, card games for money or drawings for prizes, or participate in any other form of gambling within park limits, whether they are for charity or otherwise.

(Code 1967, § 39-56; Code 1980, § 38-44)

## Sec. 38-65.  Peddling, vending and merchandising.

(a)   *Prohibitions:* No person, organization or firm, other than the parks and recreation department, or duly authorized concessionaires, shall expose or offer for sale, rent, or trade, any article or service, or station or place any stand, cart or vehicle for the transportation, sale or display of any merchandise, within the limits of any park.

(b)   *Grant of concession privilege:*

  (1)   The city may authorize concessions in city parks by means of contractual agreement(s) or concession permit(s). Wherever practicable, and unless otherwise provided herein, concession privileges shall be granted by the city manager to particular vendors on the basis of a request for proposals, competitive bid or other competitive method.

  (2)   Contractual agreements shall be executed to affect day-to-day, weekly, and/or other concession privileges of a regular, ongoing or continuous nature to private, for-profit, and/or commercial operators. Permits shall ·be issued to affect concession privileges for either programs of nonprofit organizations, under the conditions prescribed herein, or for special events. "Nonprofit concession permits" may be issued for a maximum term of one year by the parks and recreation department director or designee for such privileges granted to qualified nonprofit organizations only in connection with regular ongoing weekly programs operated in city parks by said organizations for youth, elderly or disabled persons. "Special event concession permits" may be issued by the director or his designee for such privileges granted only in connection with special events, activities and/or

Ex. 5/1

adjust such schedule of concession fees and compensation prior to the first day of September, and such revised schedule shall become effective the first day of October. In reviewing the existing schedule of concession fees and compensation to determine whether or not to revise and adjust the same, the city manager shall take into consideration any one, or all of the following criteria: (i) city financial needs; (ii) operating expenses; (iii) market conditions; (iv) purpose and type of event(s) or program(s) conducted in connection with the concession, including benefits to the community; (v) estimated revenues to be generated; (vi) and/or other factors deemed appropriate by the city manager. At any time, if the city manager determines that the current schedule of concession fees and compensation does not properly address a particular type of special event or social function, the city manager shall be authorized to negotiate the concession fee and compensation, in the case of specific event or function, or establish a concession fee and compensation, in the case of a type of event or function which is likely to reoccur.

(Code 1967, § 39-57; Ord. No. 10123, § 1, 7-10-86; Ord. No. 11196, § 2, 10-27-94; Code 1980, § 38-45; Ord. No. 11411, § 2, 11-21-96)

## Sec. 38-66.  Advertising and signs.

No signs or advertising shall be posted within park limits other than those erected by the parks and recreation department. Bulletin boards are exclusively for official park business. Items not related to the park or recreational programs shall not be placed on the bulletin boards.

(Code 1967, § 39-58; Ord. No. 10125, § 6, 7-10-86; Code 1980, § 38-46)

## Sec. 38-67.  Public demonstrations, concerts, speeches, etc.

No speeches or demonstrations, exhibitions, concerts, parades, dances or similar activity shall be allowed in any park unless a permit is obtained in advance from the parks and recreation department. Such permit shall define the nature of the activity and set forth limitations as to hours, attendance and equipment to be used, along with any other restrictions deemed necessary.

(Code 1967, § 39-59; Ord. No. 10125, § 1, 7-10-86; Code 1980, § 38-47)

## Sec. 38-68.  Restrooms.

No person shall loiter in or around any restroom facility. Children over five years of age shall not go into restrooms designated for the opposite sex.

(Code 1967, § 39-60; Code 1980, § 38-48)

## Sec. 38-69.  Alcoholic beverages; intoxicated persons.

(a)    Possession or consumption of alcoholic beverages within park limits of any public park is prohibited except as follows:

(1)    Alcoholic beverages may be sold and consumed at Fort Dallas Park,



# Miami: Code

Email Us | Refresh Code | Print | F.A.Q. | Help

**Single Word Search:** _____ [Search] *Advanced Search*

Show Table of Contents |Views |Frames

Previous Page                                                  Next Page

CHARTER AND CODE City of MIAMI, FLORIDA Codified through Ord. No. 12379, enacted June 12, 2003. (Supplement No. 22)
    Chapter 38 PARKS AND RECREATION*
        ARTICLE II. USE REGULATIONS
            Sec. 38-73. Permits--Purpose; application.

Permits are required for certain activities so that park personnel can limit or eliminate activities which would tend to damage the park, or which are likely to create an atmosphere which would discourage use of the park for its intended purpose, or which, if not eliminated, would allow monopolizing of a park or some facilities in a park by one group to the exclusion of other groups or individuals. The application form shall be completed by the applicant and approved by appropriate city officials prior to issuance of any permit referred to by this article.

(Code 1967, § 39-65; Code 1980, § 38-53)

## Sec. 38-74.  Same--Activities for which required.

Permits are required for the following activities:

(1)    Use of group camping areas.

(2)    Use of large (group-size) cooking grills.

(3)    Use of community building.

(4)    Use of baseball or softball diamond.

(5)    Use of a football field.

(6)    Special activities in park:

a.    Making speeches or giving lectures.

b.    Giving a demonstration.

c.    Giving a performance.

d.    Giving an exhibition.

e.    Giving a concert.

f.    Holding a rally.

g.    Having a parade.

h.   Holding a dance.

i.   Any other activity similar to those listed.

(Code 1967, § 39-66; Code 1980, § 38-54)

## Sec. 38-75.  Same--Rules and conditions.

The following rules and conditions shall apply to permits issued pursuant to this article:

(1)   They are issued on a first come, first served basis.

(2)   Permits are nontransferable, and are good only on the date specified.

(3)   The permittee will be held responsible for the conduct of the entire group.

(4)   The permittee shall observe, obey and comply with the rules and regulations established by this article, as well as all applicable city, county, state and federal laws, rules and regulations.

(5)   The permittee shall assume all risk in the use of the facility and shall be solely responsible and answerable in damages for all accidents and injury to person or property.

(6)   A deposit will be required for certain activities when the permit is granted. The deposit will be returned upon inspection by park personnel verifying that the facility has been cleaned up.

(7)   Special conditions related to the various types of facilities are printed on the permit forms.

(Code 1967, § 39-67; Code 1980, § 38-55)

Previous Page                                                          Next Page

EXHIBIT 6

11/21/03 FRI 14:50 FAX 305 547 0735    STATE ATTORNEY    @009

**FTAA**    COMPLAINT/ARREST AFFIDAVIT    #1039

DEFENDANT'S NAME: WHITE SEAN MICHAEL    DOB: 03/05/1979    M W H 62 150 RED

LOCAL ADDRESS: 40 LINCOLN ST. ATHENS OHIO    (282)1425

PERMANENT ADDRESS: SAME AS LOCAL

PLACE OF BIRTH: COOK OHIO

DRIVER'S LICENSE NO: 0503 118 3001 OHIO    SOCIAL SECURITY NO: 274 63081

ARREST DATE: 11/20/2003 9:30 PM    W. FLAGLER ST. NE 3AVE

CHARGES:
- Parade + Assembly Prohibition — CITY ORDINANCE 54-6.1 12-11
- Battery P.O. — Fernandez MIAMI

On the 20 day of NOV. 2003 4:30 PM    NE 3AVE W. FLAGLER ST

DEF WAS PART OF AN ILLEGAL ASSEMBLY THAT HAD SEVERAL HUNDRED PERSON PARTICIPATING. THE ASSEMBLY HAD EXCEEDED THE THIRTY MINUTES PERMITTED BY LAW AND THE DEF HAD AMPLE OPPORTUNITY TO DISPERSE. AFTER BEING GIVEN SEVERAL COMMANDS TO LEAVE DEF ARRESTED. DEF KICKED OFFICER STRIKING RIGHT KNEE, ADDITIONALLY CHARGED

OFC F.A. SALLANO
OFC F.A. SALLANO

Sworn to and subscribed before me the undersigned authority, the 20TH OF 2003

1-27-04;  4:33PM;                                                                              # 5/ 16

## COMPLAINT/ARREST AFFIDAVIT

**FTAA**

DEFENDANT'S NAME: DOE JUAN

DOB: 01/01/1965

Arrest Date: 11/20/2003   Arrest Time: 0980   Arrest Location: FLOR ST SE BANE

LEFT / RIGHT NECK

CHARGES:
1. PUBLIC ASSEM PROHIB   Activity: N   Type: N   Counts: 1   STATUTE: CITY ORD   54-6.1

OF THE CODE OF FTAA

On the 20 day of NOV 2003 at 0980 AM/PM at E. FLOR ST SE BANE

committed the following violation of law: Narrative: (Be specific) ON THURSDAY NOV 20, 2003 THE DEFENDANT WAS PART OF AN ILLEGAL PUBLIC ASSEMBLY THAT HAD SEVERAL HUNDRED PEOPLE, THE ASSEMBLY EXCEEDED THE (30) MINUTES PERMITTED BY LAW, THEY WERE ADVISED TO DISPERSE, AT WHICH TIME THE DEFENDANT REFUSED HE WAS THEN ARRESTED.

☒ NOTE REFUSED TO GIVE ANY PERSONAL INFO PAGE 1 OF 1

Officer's Name (Print): Fehmy, R
Officer's Signature: Fehmy, R
Department Name: MPD
Court ID Number/Law Code: SB01

Sworn to and subscribed before me this 20 TH day of November 2003

Signature: 4128

## COURT COPY

Ex. 6/2

FROM :    1-27-04; 4:33PM;      FAX NO. : 3053785287     Nov. 15 2003 04:32PM P2

Received

3191438-3

01

Fletcher, Christopher   11 15 1980   M W A   59 160 Brn Bl

2 crosses

unk   Virginia

11 15 2003    11:50    E Flagler St NE 2 Ave

unk

USA

| Charge | | | |
|---|---|---|---|
| Obstruct of Sidewalk | M N 1 | | 54-2(6 |
| Resisting Arrest w/o Violence | M N 1 | 843.02 | |

37-1

15    Nov    03    11:48       E Flagler St NE 2 Ave

While on bicycle patrol at the above location, the bike squad observed (4) four w/m's on the southeast corner of E Flagler and NE 2 Ave obstructing the sidewalk. The listed defendant was told clear the sidewalk however refused. Def was arrested. While attempting to place def hands into a cuffing position (behind his back) def resisted. Sgt Smyth and myself Ofc Pelham eventually were able to cuff the subject without further delay. Def also refused to give his name and general info at the scene

G. Pelham

34 Pelham

01-MEC    318 26

NOV 15 2003

**COMPLAINT/ARREST AFFIDAVIT**

FTAA MDPD-616                                    MDPD FTAA

☑ Felony ☐ Misdemeanor ☐ Traffic    99992   62 3379-B   ME 357893
☐ Juvenile ☐ Warrant

**DEFENDANT'S NAME** Last: Walsh  First: Hannah  Middle:   DOB: 02/22/1965  Sex: F  Race: W  Height: 5'9"  Weight: 160  Hair: BN  Eyes: BL/u

**LOCAL ADDRESS** 4852 N. Kenmore  City: Chicago, Ill  Zip: 60640  Phone: 773 561 5093

**DRIVERS LICENSE NO.** State: Ill  Social Security No: 381 88 3898

Occupation: Sales  Place of Birth: Ill.

Scars, Tattoos, Unique Physical Features: Glasses

**Arrest Date** 11/21/2003  **Arrest Time** 5:15 ☐A.M. ☑P.M.  **Arrest Location** 14 ST. NW. 11 AVE.

Citizenship: USA

**CHARGES**
1. UNLAWFUL ASSEMBLY  Activity: N  Type: N  Counts: 1  Statute: 870.02

OF THE CODE OF MIAMI-DADE

The undersigned certifies and swears that he has just and reasonable grounds to believe, and does believe that the above named Defendant:

On the 21 day of NOVEMBER 2003 At 5:15 ☐A.M. ☑P.M. 14 ST. NW. 11 AVE. ROADSIDE

committed the following violation of law: Narrative: (Be specific) ON NOVEMBER 21, 2003, DEFENDANT WAS OBSERVED BY THIS OFFICER AT A PUBLIC ASSEMBLY INVOLVING MORE THAN (8) PEOPLE OUTSIDE THE BUILDING LOCATED AT 14 ST. NW 11 AVE, IN MIAMI-DADE COUNTY. THIS GROUP OF PEOPLE WERE ASSEMBLED TOGETHER FOR OVER 30 MINUTES FOR THE PURPOSES OF PROTESTING THE ARREST OF FRIENDS AT THE FTAA PARADE. THE DEFENDANT WAS ARRESTED AND TRANSPORTED TO EARLINGTON HIGHTS FOR PRISONER PROCESSING. THE ORDER TO DISPURSE WAS ISSUED BY LT. SCHMIDINGER #5000  PAGE ___ OF ___

Hold for Other Agency

I Swear that the above Statement is correct and true to the best of my knowledge and belief.

Officer (Name Print): E. ROLLES

**Officer's Signature**

Department Name: MDPD  Court ID Number/Loc. Code: 4805 93

Sworn to and subscribed before me, the undersigned authority this ___ day of Novemer 2003

Deputy of the Court / Notary

32.02.09-9  Rev. 2/99

**COURT COPY**

Ex. 6/4

T 425

**COMPLAINT/ARREST AFFIDAVIT**

62-3359-B

FTAA MDPD-925

☐ Felony ☐ Traffic
☐ Juvenile ☐ Warrant

Agency Code: **30**

Municipal P.D. Dol ID No.

MDPD

V-103357880

| DEFENDANT'S NAME | Last | First | Middle | DOB mo/day/yr | Sex | Race | Ethnic. | Height | Weight | Hair | Eyes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| WHITE, VICTORIA | | | | 02/18/1975 | W | F | | 59 | 128 | RED | BRN |

LOCAL ADDRESS: Street **71 Rondell Place** City **San Francisco** State **CA** Phone **415 621 3560** Alias

PERMANENT ADDRESS: Zip **94103**

Address Source: ☑ Verbal ☐ Voter's I.D. ☐ Driver's License ☐ Other

BUSINESS ADDRESS: Occupation **ADMIN** Place of Birth **MINN**

DRIVER'S LICENSE NO. **UNK** State Social Security No. **474085691** Scars, Tattoos, Unusual Physical Features **GLASSES**

Weapon Seized? Type ☐ Yes ☑ No Arrest Date mo/day/yr **11/21/2003** Arrest Time **5** ☑ A.M. ☐ P.M. Special location (include name of business) **NW 41st / 11 Ave** GRID

If Def. has Concealed Weapons Permit: PERMIT # **W-** For Robbery, Burglary, F/A Viol: Suspected History of drug involvement? ☐ Yes ☐ No No. Cases Cleared Influence of Drugs ☐ Yes ☑ No ☐ Unk. Influence of Alcoh. ☐ Yes ☑ No ☐ Unk. Citizenship **USA**

CO-DEFENDANTS: Last First Middle DOB mo/day/yr ☐ In Custody ☐ Felony ☐ Juvenile ☐ At Large ☐ Misdemeanor

**SIGNAL:** ☐ 100 ☐ 150 ☐ 200 ☐ 250 ☐ 300 ☐ 400

| | CHARGES | Activity | Type | Counts | STATUTE | O.V. | ... |
|---|---|---|---|---|---|---|---|
| 1. | UNLAWFUL ASSEMBLY | NN | 1 | | 870.02 | | |
| 2. | | | | | | | |
| 3. | | | | | | | |
| 4. | | | | | | | OF THE CODE OF **DADE** |

The undersigned certifies and swears that he has just and reasonable grounds to believe, and does believe that the above named Defendant

On the **21st** day of **NOV. 2003** at **5:15** ☐ A.M. ☑ P.M. (Time) **NW 14st & NW 11 Ave (Roadside)** (Location, include name of business)

committed the following violation of law: Narrative: (Be specific) ON NOVEMBER 21, 2003, Δ WAS OBSERVED BY ME AT A PUBLIC ASSEMBLY INVOLVING MORE THAN EIGHT (8) PEOPLE ON NW 14st & NW 11 Ave IN THE CITY OF MIAMI, MIAMI-DADE COUNTY. THIS GROUP OF INDIVIDUALS WERE ASSEMBLED TOGETHER FOR OVER 30 MINUTES FOR THE PURPOSE OF THE FTAA PROTEST. Δ WAS PREVIOUSLY ORDERED BY MIAMI DADE POLICE LIEUTENANT, J. SCHMIDINGER TO DISPERSE AND REFUSED. Δ WAS THEN ARRESTED.

PAGE 1 OF 1

Hold for Other Agency: Agency _____ Verified by _____

☐ HOLD FOR BOND HEARING, DO NOT BOND OUT (Officer Must Appear at Bond Hearing).

I Swear that the above Statement is correct and true to the best of my knowledge and belief.

Officer's Name (Print) **BONILLA, M**

Officer's Signature _____

Department Name **MDPD** Court ID Number/Loc. Code **3935** (**90**)

Sworn to and subscribed before me, the undersigned authority, this ___ day of **November 2003**

Deputy of the Court Administrator _____

I understand that should I wilfully fail to appear before the court as required by this notice to appear that it may be held in contempt of court and a warrant for my arrest shall be issued. Furthermore, I agree that notice concerning the time, date, and place of all court hearings should be sent to the above address. I agree that it is my responsibility to notify Clerk of the Court (Juveniles notify Family Division Juvenile Section) anytime that my address changes.

You need not appear in court, but must comply with the instructions on the reverse side hereof.

Signature of Defendant / Juvenile and Parent or Guardian _____

32.02.09-9 Rev. 2/98

#3935

**COURT COPY**

Ex. 6/5

NC/RA

FTA △ MDPD-20

99970   6232122

HC25791

| Last | First |
|---|---|
| Willner | Sarah |

0 212/1950  F W  53 130 Gray Brn

LOCAL ADDRESS: 2390 D. St. Hayward CA 94591  530 582 7020

Address Source: ☒ Verbal  ☐ Voter's I.D  ☐ Driver's License  ☐ Other

Occupation: None  Place of Birth: MD

DRIVER'S LICENSE NO.

Social Security No: 212504167

Scars, Tattoos, Amput, Physical Features: Glasses

Arrest Date (mo/day/yr): 11/21/2003  Arrest Time: 515 ☐ A.M. ☐ P.M.

Arrest Location (include name of business): 11/14 St Clark (Rosshead)

PERMIT # W-

SIGNAL: ☐100 ☐150 ☐200 ☐250 ☐300 ☐400

| CHARGES | Activity | Type | Counts | STATUTE | D.V. | | VIOLATION OF SECT. |
|---|---|---|---|---|---|---|---|
| 1. Unlawful Assembly | H | U | 1 | 870.02 | | | |
| 2. | | | | | | | |
| 3. | | | | | | | |
| 4. | | | | | | | |

OF THE CODE OF: Dade.

The undersigned certifies and swears that he has just and reasonable grounds to believe, and does believe that the above named Defendant

On the 13 day of November 2003 at 515 ☐ A.M. ☐ P.M. (Location, include name of business)

committed the following violation of law: Narrative: (Be specific) On 11/21/03, I was observed by this officer @ a public assembly involving more than eight (8) people on NW 14 St Biscayne in the City of Miami, Miami-Dade County. This group of individuals were assembled together for over 30 minutes for the purpose of the FTAA protest. An order to disperse was given by Lt. Schumacher (15000) in I refused to comply. I was arrested & transported to Burlington MTS Station for processing.

PAGE 1 of 1

Signatures and stamps at bottom.

November 2003

Ex. 6/6

Received Fax    JAN 27 2004 12:46PM    Fax Station : LAW OFFICE OF CAROL A. SOBEL    p. 15

1-27-04; 4:33PM;

FTAA MDPD-13

MDPD FTAA

99927  623 217 B

No 35788

| | | | 06 / 08 / 1983 | F W | 5'2 | 125 | BRO | BU |

**LOCAL ADDRESS**

CORY FISHER-HOFFMAN
131 CYNWYDRD BALA CYNWYD PA
19004

GREEN CIRCLE RT ANKLE

| Weapon Seized Type | | Arrest Date (mo/da/yr) | | Arrest Time | | Arrest Location (include name of business) | | GRID |
| Yes / No | | 11 / 21 / 2003 | | 1313 | AM / PM | 1454  12 & RE NW | | |

PERMIT # W-

CHARGES:

| CHARGES | Activity | Type | | STATUTE | D.V. | DAC | CAPIAS | BW | FW | DPW | CITN | VIOLATION OF SECT. |
| 1. UNLAWFUL ASSEMBLY | N | N | 1 | 870.02 | | | | | | | | |
| 2. RESISTING OFFICER WITHOUT VIOLENCE | N | N | 1 | 843.02 | | | | | | | | |
| 3. | | | | | | | | | | | | |
| 4. | | | | | | | | | | | | |

The undersigned certifies and swears that he has just and reasonable grounds to believe, and does believe that the above named Defendant

On the 21 day of NOVEMBER 2003 N 313 AM/PM (Time)    14 BNW 11AV (Location; include name of business)

committed the following violation of law; Narrative; (Be specific) ON THIS DAY, NOVEMBER 21, 2003, DEFENDANT WAS OBSERVED BY THIS OFFICER AT 14TH STREET NW 11 AV, A PUBLIC ASSEMBLY INVOLVING MORE THAN EIGHT PEOPLE OUTSIDE THE BUILDING LOCATED AT 14TH STREET AND NW 11AV. THIS GROUP OF PEOPLE WERE ASSEMBLED TOGETHER FOR OVER 30 MINUTES FOR THE PURPOSE OF FTAA PROTEST. (FEDERAL TRADE). THE GROUP WAS ORDERED TO DISPERSED (LEAVE) BY SCHMIDINGER, N.5000. THE ARREST WAS BASED UPON PROTESTING IN AN AREA THEY WERE NOT ALLOWED

PAGE ___ OF 2

J. MABWUD

MDPD    4352 (E 6)
Department Name    Court ID Number/Loc. Code

November 2003

12.02.00-B  Rev. 2/99

— Ex. 6/7

1-27-04;  4:33PM;                                                          ; 1                      # 16/ 16

COMPLAINT/ARREST
CONTIN...

99927  623217-B
171035788

30

DEFENDANT'S NAME  DOE, JANE

AWAY FROM WHERE THEY WERE ALLOWED TO PROTEST. THE DEFENDA
WAS ARRESTED. WHEN THE DEFENDANT WAS ORDERED TO BE HANDCUFFED
SHE REFUSED. EVENTUALLY SHE AGREED AND WAS HANDCUFFED.